IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No. 13-00293-01-CR-W-BCW |
| LOGAN J. SMITH, | |
| Defendant. | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S
REQUEST FOR DOWNWAD DEPARTURE**

The United States of America, by and through undersigned counsel, opposes the defendant's request for a downward departure. In support of its opposition, the government submits as follows:

**I.   INTRODUCTION**

The defendant has filed a Sentencing Memorandum in which he requests a downward departure from the sentencing guidelines pursuant to United States Sentencing Guidelines (U.S.S.G.) Sections 5H1.4 (physical condition), 5H1.3 (extraordinary mental or emotional problems) and 5K2.13 (diminished capacity). Def.'s Sent. Mem. After reviewing the defendant's basis for the proposed departure and considering the 18 U.S.C. § 3553(a) sentencing factors, the government opposes the defendant's motion because there are no valid grounds for a downward departure and recommends a sentence within the applicable Sentencing Guidelines.

**II.  PROCEDURAL BACKGROUND**

On August 28, 2013, the defendant appeared before U.S. District Judge Brian C. Wimes, waived his right to be charged by indictment, and pled guilty to a two-count information charging him with one count of Conspiracy against Rights in violation of 18 U.S.C. § 241 and

1

one count of Interference with Fair Housing Rights in violation of 42 U.S.C. § 3631. The Court accepted the guilty plea which was entered pursuant to a written plea agreement.

The plea agreement contains several provisions concerning the application of the Sentencing Guidelines to this case. In sum, the parties agree that the base offense level for the defendant's conduct is 24 pursuant to U.S.S.G. § 2K1.4(a)(1), that a 3-level enhancement for a hate crime is applicable pursuant to § 3A1.1(a), and that the defendant is entitled to a 3-level reduction due to his acceptance of responsibility pursuant to § 3E1.1(b). Plea Agreement ¶ 10(d). Thus, the parties agree that the applicable sentencing guidelines are calculated as a level 24. The parties, however, expressly reserved their rights to argue any other enhancements or reductions as well as their rights to seek a variance or departure from the guidelines. Plea Agreement ¶ 10(i).

On November 18, 2013, United States Probation filed a Presentence Investigation Report (PSR) that calculated the defendant to have a criminal history category of III and a total offense level of 24, which results in a guideline imprisonment range of 63 to 78 months and a guideline term of supervised release of 1 to 3 years. PSR ¶ 47 and 51. The Probation Office identified two potential grounds for departure, U.S.S.G. §§ 5H1.3 (Mental and Emotional Condition) and 5H1.4 (Physical Condition), but noted that it was not necessarily recommending such a departure. PSR ¶ 61 and 62. The Probation Office responded to the defendant's request that the defendant's diminished capacity be listed as a ground for departure by indicating that the Probation Office has no information to support the notion that the defendant has a diminished capacity. PSR Addendum.

On January 6, 2014, the defendant filed a Sentencing Memorandum requesting a guidelines departure. The United States hereby files its response, in advance of sentencing that is scheduled before the Honorable Judge Wimes on January 23, 2014, at 10:00 a.m.

### III. FACTUAL BACKGROUND

The evidence in this case establishes that on June 26, 2008, the defendant and Victoria Cheek Herrera threw a burning Molotov cocktail into a house that an African American family was renting in Independence, Missouri, because the family was African American. The family inside of the house consisted of an adult couple and four young daughters, then ages 12, 9, 5, and 4. The attack occurred in the evening, when the family was preparing to go to sleep. The defendant and Cheek Herrera threw the Molotov cocktail into the side of the house near the 9-year-old girl's bedroom window, which understandably startled her. The incendiary device caused the side of the house to catch fire but the fire was extinguished by a neighbor relatively quickly, preventing extensive damage. Still, the victims were genuinely fearful as a result of the incident and immediately moved out of the neighborhood. As indicated in the PSR, one of the victims stated that if the Molotov cocktail had impacted five inches in a different direction it would have gone through the window and potentially killed one or more of her daughters. PSR ¶ 5.

Per the factual basis in the plea agreement, the defendant admitted that he and Cheek Herrera discussed their desire to set fire to the victims' home. Plea Agreement ¶ 3. Specifically, a witness stated that the witness heard the defendant say that there are a "whole bunch of niggers in [the victims'] house and we don't like them."

The defendant admitted that he and Cheek Herrera asked a juvenile acquaintance for gasoline and that he then helped partially fill a glass bottle with gasoline. The defendant then

helped make a denim wick that was placed inside the bottle. At one point on the date of the incident, the defendant, with the assistance of Cheek Herrera, had a swastika drawn on his head. The defendant subsequently made racially-disparaging remarks and gestures, including stating "White Power!" and making "Heil Hitler" gestures. The defendant and Cheek Herrera also drew a swastika and wrote the words "White Power" on the driveway to the victims' residence. The defendant and Cheek Herrera ultimately carried the gasoline-filled bottle to the victims' residence, and the defendant, with the assistance of Cheek Herrera, lit the denim wick and threw the gasoline-filled bottle into the side of the house. Plea Agreement ¶ 3. A witness stated that immediately after the incident, the defendant stated "I threw it through the window," and Cheek Herrera replied "you didn't, you hit the siding, you idiot."

The defendant additionally admitted that after he set fire to the victims' house, he fled the scene and told an acquaintance not to tell anyone about the vandalism and fire or the defendant and Cheek Herrera's role in it. Plea Agreement ¶ 3.

When the defendant was interviewed by local law enforcement officers shortly after the incident, he indicated that he knew the officers were questioning him about a "hate crime." Further, he admitted to the investigators that he was present during the incident but claimed that the arson was Cheek Herrera's idea and his only role was loaning her his lighter. He later gave a similar account to the Federal Bureau of Investigation, stating, in essence, that he merely observed Cheek Herrera commit the arson.

## IV.    ARGUMENT

As a threshold matter, the defendant bears the burden of proving facts that warrant a downward departure. United States v. Williams, 905 F.2d 217, 218 (8th Cir. 1990) ("The government bears the burden of proving facts that support a sentence enhancement and the

4

defendant bears the burden of proving facts that support a sentence reduction.") See also United States v. Drapeau, 943 F.2d 27, 28-29 (8th Cir. 1991) (indicating that the defendant has the burden of proving facts supporting a reduction for acceptance of responsibility).

### a. Inapplicability of U.S.S.G. § 5H1.4 (Physical Condition)

The defendant first argues that a downward departure from the guidelines is warranted because the defendant suffers from an impaired physical condition, namely the lack of use of his left arm and diminished use of his left eye. Def.'s Sent. Mem.

The relevant portion of U.S.S.G. § 5H1.4 for a departure based upon a defendant's physical impairments is as follows:

> Physical condition or appearance, including physique, may be relevant in determining whether a departure is warranted, if the condition or appearance, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines. An extraordinary physical impairment may be a reason to depart downward; e.g., in the case of a seriously infirm defendant, home detention may be as, and less costly than, imprisonment.

U.S.S.G. § 5H1.4

The Eighth Circuit has explained that a "departure based on a physical condition is a discouraged ground on which to depart and should be limited to exceptional circumstances." United States v. Coughlin, 500 F.3d 813, 818 (8th Cir. 2007). In evaluating the validity of the departure, the Eighth Circuit has considered whether the defendant's physical condition would cause the defendant to find imprisonment more than the normal hardship, subject the defendant to more than the normal inconvenience or danger, or have a substantial present effect on the defendant's ability to function. Id. In terms of the second inquiry, whether the defendant is subjected to greater inconvenience or danger, the court questioned whether "imprisonment would worsen his or her condition or [whether] he or she [would] require special care not provided by the [Bureau of Prisons]." Id.

5

In the case at hand, the defendant has provided no support for the application of the aforementioned guideline. The defendant's physical impairment does not make imprisonment more than the normal hardship, increase him to more than the normal inconvenience or danger, or have a substantial effect on his ability to function. The defendant's physical disability does make certain daily functions more difficult for him, but those difficulties are the same regardless of whether the defendant is in prison or in the general population. Moreover, the defendant has provided no showing that the Bureau of Prison cannot accommodate his physical disability by providing the services necessary to help him cope in an incarcerated environment. It is also important to note that the defendant is capable of considerable mobility in his daily life, as evidenced by the fact that he functions independently and had the physical dexterity necessary to commit the underlying crime.

### b. Inapplicability of U.S.S.G. § 5H1.3 (Mental and Emotional Condition)

The defendant next argues that a departure under U.S.S.G. § 5H1.3 is warranted based upon his mental and emotional conditions. Def.'s Sent. Mem. Section 5H1.3 states that "[m]ental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions . . . are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines [and in] certain cases a downward departure may be appropriate to accomplish a specific treatment purpose." U.S.S.G. § 5H1.3.

The defendant has failed to meet his burden of showing that his mental and emotion conditions warrant a departure. The defendant relies primarily on a psychological report that indicates that the defendant's IQ, as tested in 2008, is below average. The defendant fails to explain, however, why a lower IQ distinguishes the defendant's conduct from other cases typically covered by the guidelines. A below average IQ does not on its own constitute an

6

unusual mental condition that warrants a departure. Moreover, there has been no showing that probation, as opposed to incarceration, is needed to provide the defendant with a specific mental health treatment purpose.

### c. Inapplicability of U.S.S.G. § 5K2.13 (Reduced Mental Capacity)

The defendant's final argument is that a departure is warranted pursuant to U.S.S.G. § 5K2.13 because the defendant's low IQ indicates a diminished mental capacity. Def.'s Sent. Mem. Here, the defendant cites the aforementioned psychological report that states that the defendant has difficulty making good decisions. Id.

Section 5K2.13 provides that a downward departure due to diminished capacity may be warranted in certain circumstances:

> A downward departure may be warranted if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense. Similarly, if a departure is warranted under this policy statement, the extent of the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense.
>
> However, the court may not depart below the applicable guideline range if (1) the significantly reduced mental capacity was caused by the voluntary use of drugs or other intoxicants; (2) the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence; (3) the defendant's criminal history indicates a need to incarcerate the defendant to protect the public; or (4) the defendant has been convicted of an offense under Chapter 71, 109A, 110, or 117, of Title 18, United States Code.

U.S.S.G. § 5K2.13

According to the section's application note, "'[s]ignificantly reduced mental capacity' means the defendant, although convicted, has a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful." U.S.S.G. § 5K2.13 app. n. 1.

Here, the defendant has not shown that he had a significantly reduced mental capacity at the time of the crime. As an initial matter, the defendant clearly understood the wrongfulness of

7

his behavior at the time he committed the crime. By pleading guilty, the defendant admitted that his intention in carrying out the arson was to violate the civil rights of the victims because they were African American. In other words, the defendant admitted that at the time of the incident he knowingly targeted the victims out of ethnic animus. The defendant's knowledge of the wrongfulness of his crime is also evident from his consciousness of guilt. The defendant told an acquaintance immediately after the incident that the witness should not tell anyone about the arson or the vandalism. Moreover, the defendant described the incident as a "hate crime" to law enforcement investigators, and he minimized his role in the arson when talking to investigators by, in essence, implicating Cheek Herrera as the sole perpetrator.

In addition, there is no evidence that the defendant's mental condition prevented him from controlling behavior that he knew was wrongful. The underlying offense was not an impulsive decision made by the defendant, but one that he and his co-conspirator planned out over the course of several hours. The planning that went into the attack, along with the swastika and racist words that the defendant helped draw on the victims' driveway, demonstrate that this was not an instance of the defendant not being able to control a mental disorder but rather a premeditated and planned attack.

Finally, even if there were evidence of "significantly reduced mental capacity," a downward departure would not be warranted under Section 5K2.13 because "the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence." See United States v. Dillard, 975 F.2d 1554, 1555 (8th Cir. 1992) (stating that a Section 5K2.13 departure is only applicable for non-violent offenses). It is an understatement to state that the underlying offense involved actual violence. The defendant quite literally threw a fire bomb at a house inside which a couple and

8

their four young daughters were readying for bed. As one of the victims pointed out, had the defendant thrown the device five inches in another direction, the Molotov cocktail would have gone through the window to the victims' house and very possibly led to the loss of life. PSR ¶ 5. Moreover, according to a witness, the defendant incorrectly asserted after the incident that he threw the incendiary device through the window, which demonstrates that his intent was to set fire to the interior of the house and cause maximum damage. All of the parties, including the defendant, were fortunate that the device only impacted the side of the house and that the fire was extinguished relatively swiftly.

### d. Government's Sentencing Recommendation

While the Guidelines are no longer mandatory, they should be "the starting point and the initial benchmark" in determining an appropriate sentence. Gall v. United States, 552 U.S. 28, 49 (2007). Courts then are to consider the factors set forth in 18 U.S.C. § 3553(a). Id. at 49-50.

Discussing these factors in United States v. Booker, the Supreme Court cited the statute:

> The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The courts, in determining the particular sentence to be imposed, shall consider –
>
> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
>   (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>   (B) to afford adequate deterrence to criminal conduct;
>   (C) to protect the public from further crimes of the defendant; and
>   (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for –

> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines – * * *

(5) any pertinent policy statement * * *

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

United States v. Booker, 543 U.S. 220 (2005)

Here, the government submits that a guideline sentence in the range of 63 to 78 months is sufficient, but not greater than necessary, to comply with the considerations set forth in Section 3553(a). In making that recommendation, the government reiterates that the defendant's criminal conduct was extremely serious and had the potential of causing loss of life to at least six individuals, four of whom were children. A guideline sentences would reflect the seriousness of the offense, promote respect for the law, and provide a just punishment. It will also help deter future racially-motivated crimes in the community by demonstrating that the justice system deals with such acts in a serious manner. In addition, a guidelines sentence would protect the public from further crimes by the defendant during his time of incarceration. Finally, a guidelines sentence also comports with the Section 3553(a) factors because such a sentence avoids unwarranted sentencing disparities among defendants who have been found guilty of similar crimes. This is true both in the case at hand, in which the defendant and a co-conspirator both pled guilty to their roles in what was essentially a joint crime, and with respect to other defendants who have been recently sentenced in the Western District of Missouri for committing a racially-motivated arson. See United States v. Theresa Witthar, No. 11-00205-01-CR-W-DW.

The government also notes that it supports the Probation Office's recommendation for restitution, as outlined in the PSR. PSR ¶ 59.

## V. CONCLUSION

After considering the defendant's proposed justifications for a downward departure and the Section 3553(a) sentencing factors, the government contends that no grounds for a downward departure exist and recommends a sentence within the applicable and appropriate sentencing guidelines.

Respectfully submitted,

Tammy Dickinson
United States Attorney

By: */s/ David M. Ketchmark*

DAVID M. KETCHMARK
First United States Attorney

Charles Evans Whittaker Courthouse
400 E. Ninth Street, Suite 5510
Kansas City, Missouri 64106
Telephone No. (816) 426-3122

JOCELYN SAMUELS
Acting Assistant Attorney General
Civil Rights Division
United States Department of Justice

By: *s:/Shan P.Patel*

Shan P. Patel
Trial Attorney
Criminal Section
Civil rights Division
United States Department of Justice

CERTIFICATE OF SERVICE

   The undersigned hereby certifies that a copy of the foregoing was delivered on January 22, 2014, to the CM-ECF system of the United States District Court for the Western District of Missouri for electronic delivery to all counsel of record.

                */s David M. Ketchmark*
                David M. Ketchmark
                First United States Attorney